Court of Appeals for the Federal Circuit now open and in session. God save the United States and this honorable court. Good morning ladies and gentlemen. We have four cases on our calendar this morning. Representative of the diverse docket we have, case from the Court of Federal Claims, a tax case, patent case in the district court, veterans appeal and an employee case. The latter are being submitted on the briefs and will not be argued. First case is ENERGY EAST CORPORATION v. United States, 2010-51-32. Mr. Kass. Good morning, your honors. May it please the court, Larry Kass of Milbank Tweed representing Appellant ENERGY EAST. And at council table with me on the left is Joe Persinger, my colleague and also Gil Polt. I'm reserving five minutes for rebuttal. With your permission before I delve into the main of my argument and address your questions on that, I'd like to address a point at page 16 of our reply brief, just for a few minutes if you'll permit me. At page 16 we make the point that general interest income and expense of a consolidated parent and sub is reported and netted on a single consolidated return. And that includes general interest income and expense such as overpayment interest and underpayment interest received and paid that year. Yet the government takes a position that refuses to apply section 6621D to that very same interest to determine the rate. There's no disputing that the interest at issue here was reported on the post acquisition consolidated return of ENERGY EAST. That's supported not only by our brief but by the CFC opinion in the government's own brief. For example, at pages four to seven of the red brief it acknowledges that it wasn't until after consolidation that it was even determined RG&E, the sub, had outstanding overpayments arising from earlier tax years. But Mr. Kass, the overpayments and the underpayments weren't by the same taxpayer, were they? They weren't. The overpayments and underpayments were not made by the same taxpayer. That's what the statute requires for the netting of the interest. Your Honor, we don't think that that's what the statute requires. The statute was purposely directed to any open periods, and so that would include the interest that occurred prior to consolidation. And just as a point of illustration, Your Honor, the fact is that both of these underpayments and overpayments, the interest on these underpayments and overpayments were determined post consolidation. It wasn't even known that these even existed, these overpayments and underpayments even existed until post consolidation. I was just saying they were determined after the consolidation. Yes, Your Honor. But the payments occurred before. Well, the payments on the interest occurred afterwards. And in fact, they were reported on the consolidated return of the taxpayer, Energy East, the payments for the interest. And in fact, on that same consolidated return, the post acquisition consolidated return, actually the interest is netted. But the problem here is the rate. But the interest is netted as to the overpayment and underpayment as to the year that they were paid. The interest might be paid later, but the underpayments and overpayments were paid before consolidation. Yes, the underpayments are paid after. If there's an assessment of an underpayment, it's paid after consolidation here. So that was also taken care of post consolidation. It wasn't even known they existed until after consolidation. But the overpayments for which you're trying to obtain credit were paid before the consolidation. They were made before consolidation, yes, Your Honor. And those were the ones that would be— But again, they weren't known that they were overpayments. But you're attributing the interest for those overpayments to the underpayments, which might have been required to be made later. But essentially, the overpayments which generates the interest would be before the consolidation. Well, they—originally, yes, Your Honor, but again, these are balances, recall. So the interest runs on the balances. The interest was continuously running both before and after consolidation. And interest goes back to the date where the payment was made, even if it was not known that it was an underpayment or an overpayment, correct? Yes, but just as a point of tax law is that these are accrual-based companies. So for tax purposes, they're actually considered to be accrued as of the time of the year that they're determined, which was a consolidated tax year. So, yes, you calculate it as if it was running from the date that the—from the tax year that it originally arose. But these are accrual-based tax years, so for tax purposes, it's considered to be accrued for tax purposes of the tax year that they paid, which was a consolidated tax year. But is the interest accrued at that particular point in time? Once they're determined, once the overpayments were determined in 2001-2002, which were consolidated tax years, that's when it's considered for tax purposes to have accrued. But it's accrued back to the original underpayment. The calculation is based on, yes, as if there was a balance running— From that time. But, again, the balance—some of the balance, as we point out at least in our alternative argument, some of that balance for the post-consolidation period was when the companies were consolidated. So at the very least, it should be considered that these companies were consolidated and won the same company for that post-consolidated time period. Remember, the statutory purpose—and it really shouldn't be lost sight of—is that the energy ease shouldn't be having to pay one rate of interest to the government while it's being charged an entirely higher rate, 4.5 percent generally, higher rate for the interest that it's paying the government on the same amount of money. And that exchange of money is occurring, recall, post-consolidation. That's all happening while they're consolidated. But promised upon those underpayments and overpayments being made by the same taxpayer. Well, it's really focused on interest, Your Honor. The statute is really focused on interest. It's focused on the payment of interest on a mutual indebtedness. And that mutual indebtedness doesn't become ripe until it's actually determined that these things actually exist, which is post-consolidation. That's when you have a mutual indebtedness. And at that point, there's an interest that's calculated, post-consolidation, and they're paying differential tax rates. But you're reading the same taxpayer language right out of the statute. Well, no, Your Honor, I don't think so, because, first of all, the term any period is followed by a clause, and that any period covers the whole clause. And they are a tax—they are a tax—the same taxpayer within that any period, which is specifically one of the—the period covers both pre- and post-consolidation. So they are a taxpayer within that period that the balances are overlapping. But the parent company was not the taxpayer within that period. It was the taxpayer within that period. When the underpayment was calculated and due, they were not the taxpayer at that point. When the underpayment was calculated and due, they were the same taxpayer. But that was attributable to the subsidiary during those 97, 98 years. No, I mean when it was—when the underpayment was calculated and due was a post-consolidated year. I understand that, but it was due from pre-consolidated years. It was due based on the fact that there was—there was a difference in a payment from in—back in 95, 97, yes. If that's—oh, I'm sorry, for Energy East, it was, I guess, 99. 99, right. Yes, Your Honor. But the point still remains that those taxes would not be due from the parent. It would due from the subsidiary's operations in the earlier years before consolidation. So they were the taxpayers. Yes, Your Honor. Well, they were the taxpayers back then, but there's nothing in the statutory language that suggests that we have to read into the statute the words arise and made in terms of when these underpayments and overpayment balances originally occurred. They're talking about periods. The very language of the title of the statute, it talks in terms of periods. Limitation on periods of tax overpayments and underpayments. It's really not focused on the time that it was—they originally arose. So you're—I mean, this comes down to a grammatical analysis, but where it says by the same taxpayer, you're saying that that modifies any period in which interest is payable or allowable as opposed to modifying the underpayment and overpayment reference. Yes, Your Honor. Slightly nuanced, but yes. By the same taxpayer modifies that entire clause in commas, set off by commas. Interest is payable, et cetera, et cetera, by the same taxpayer. The for any period applies to that whole clause. The for any period—and also harmonizes that whole clause. So the for any period, interest is payable, et cetera, et cetera, on equivalent overpayments and overpayments of the taxpayer. But there's no closing comma. I mean, we don't break up that—this is a poorly written sentence, obviously, but, I mean, these are not—the clauses are not separated. So it's difficult to determine what that by the same taxpayer is meant to modify, is it not? Well, I think that the for—well, there's two issues here. It's the for any period and it's by the same taxpayer. The for any period, I think, modifies the entire following clause from comma to comma, from the word interest all the way up to the word title, the for any period. So it's trying to—and I think you need to read the words within that clause in the context of the for any period. That's the one point. The other point, which I think you're getting at, is the same—by the same taxpayer. And I think that you have to really look at it in terms of what is the statute trying to accomplish. The statute is trying to accomplish interest netting, interest netting. So it's talking about interest. The whole purpose of the statute is netting. It's talking about periods of tax overpayments and underpayments, interest on—I should say interest on overlapping periods of tax overpayments and underpayments. That's the purpose. So to read it as the last antecedent, yes, it can refer to the last word, but it also refers to the last phrase or clause. And here, if you want to harmonize the statute and get to what the Congress was trying to get at, which was comprehensive netting to cover all tax years, the way that it should be read is to look at it as covering the interest all the way up to the end of the clause. I see I'm running into my rebuttal time right now, Your Honors. Well, hypothetically, if RG&E and the consolidated were merged together and became one subsequent to the overpayment and underpayments being calculated, would that make a difference? Could you— The two subsidiaries being merged into one. Two subsidiaries merged into one. The underpayment and overpayment would be calculated after the merger. Okay. Would that make a difference? How is it different from our scenario? Yes. How is it different from our scenario, just that it's a sub-sub versus parent-sub? No, it would be the two subsidiaries being merged into one, no parent. Okay. The surviving corporation would be the two merged subsidiaries. Right. The determination for the overpayment and underpayment is made after the merger. I see. Would that make a difference? No, and I think—well, I mean, to us, no. The government, I think, would say yes. The government would allow it in that situation. I think that's the government's answer. We don't see that as being a material difference. The same rationale should apply in that situation. So you're saying that whether it's one taxpayer or two taxpayers which have merged, at which point taxes, the overpayment is due and the underpayment is due, that zero could take place still at the pre-merger? Yes, Your Honor. The time when the balances originally arose should not be material. If at the time that the interest is determined and then later when an interest netting claim is filed, they're all part of a single group, then they each have that claim. The interest income and expense is all reported on a single return of the taxpayer, the taxpayer Energy East, under its EIN, by the way. It's all attributable to one company. So whatever belonged to the subs belonged to the parent. And that same applies in the merger scenario. But they're trying to make a distinction in a consolidated group context from a merger context. I have one last question before you sit down, and that is that, as I understand this, you're trying to recoup even for periods before the effective date of the statute? No, Your Honor. No, we're not doing that prior to the effective date of the statute. I mean, the government doesn't deny that either. So you're not trying to reach back before 1998? Well, the statute allows you to, as long as you're within the statute of limitations for the open period. But did you file all the proper? Yes, Your Honor. There's no recapture? Pardon? Did you file before 1999 for purposes of recapture? How could you do that if you weren't consolidated? I have to turn to my counsel, Mr. Persinger. Your Honor, the 1999 rule was subsequently extended so that if the statute expired later than that, you could file for earlier periods. And we did that. There's no question about that in this case. Okay. We'll pass Corsi Rova. We'll give you two minutes of rebuttal time. Okay, thank you, Your Honor. Ms. Del Sol. Good morning. May it please the Court. My name is Ellen Del Sol, and I represent the United States. In the United States' view, I think this is a very straightforward statute that requires that the same tax rate error have made the overpayment and the underpayment. And as the Court's recognized here, we have undisputed facts in the parity stipulation. The separate companies, C&P and RG&E, had the overpayments on which netting is based here. And it's also undisputed that Energy East had the underpayments and that all those overpayments and underpayments arose for periods before there was any affiliation whatsoever between these entities. They were entirely separate entities at the time that the underpayments and overpayments arose. And I think when you look at the statutory language, it's very clear in terms of the juxtaposition of the words that the same taxpayer has to be the one making the underpayments and the overpayments. Can you address Judge Gaillard's hypothetical? Well, I think you're – I was a little confused by the hypothetical because you seemed to suggest that if the subsidiaries had merged, that that would make it merge with each other. Was that your question? Because those both made overpayments here. Hypothetically, right? If the two subsidiaries, one had made the overpayment, the other one had made the underpayment, and they merged together, would that one taxpayer be allowed to take advantage of the zeroing of the interest? I think the government's answer to that question would be no. I think if you have a situation where – I mean, this sort of leaves energy east out of it in this hypothetical. You just have two corporations. One made an overpayment and one made an underpayment. And I think what the statute contemplates is looking at whether they were separate corporations at the time those underpayments and overpayments arose, not the post-merger situation. And I think, you know, you have to look at who did the underpayment and the overpayment belong to, and they belong to two separate entities. So I think the government's answer to that question would be no. That wouldn't be a different case because the taxpayer that had the overpayment and the underpayment were two separate entities at the time that that payment arose. And I think, as we explained in our brief, the nearest antecedent rule directs you to look at the way that words are juxtaposed in the statute. And I think that leads you to the conclusion, as the Court of Federal Claims found, that you have to look at whether the entities were separate at the time the underpayment or the overpayment arose. What about the language for any period? Well, I think the any period means, you know, assuming that you have the same taxpayer making an underpayment and an overpayment, the entire period of the overlap is the extent to which there's netting. You wouldn't say that part of the period of overlap. And I think you just—taxpayers' own arguments highlight the confusion that comes up if you say, if you're the same taxpayer any period, because they posit in their brief these alternative arguments where they say, well, maybe if they became the same taxpayer by the time the netting claim was filed, or maybe it's after, you know, maybe it's if they become the same taxpayer, assuming that's possible, which we don't think it is, if they became the same taxpayer while the overlap was still going on, is that enough? And then there's the question of, well, then do they get to net for the entire time of the overlap or only after the post-acquisition period? So I think taxpayers' reading of a statute to try to apply any period to the whole paragraph really creates a lot of confusion, whereas the government's construction, which the Court of Federal Claims adopted, is very clear-cut. It's consistent with statutory language. And I think because this is a provision for interest that allows— But Mr. Cass says that the interest wasn't determined until later. And the statute says interest is payable. Well, interest becomes payable from the time the overpayment arises, which is the time at which, when you go back and look at it after you figure everything out, you determine the taxpayer had paid more than they owed. And underpayment— Is that when the return is filed? It's generally when the return— Or when the audit occurs. It's generally when the return is filed. And there may be some exceptions where there are extensions and it's a different time period, but it's generally when the return is filed. And with underpayment interest, it arises when less is paid than is due by the time the return is filed. The overpayment actually could occur—I guess if you prepaid your tax earlier, you might have an overpayment. How is interest payable when the return is filed? Well, the problem is— That's when the tax is due, not interest on it. The tax is due, and the overpayment, it arises, it goes on the books, basically, as an amount that's due. But it's not always known that an overpayment was actually made or that an underpayment was made until later because you might discover that on audit. You might not know until litigation was resolved whether there was an underpayment or an overpayment. And then, basically, what the tax law does is it looks back and it says, after you've litigated and determined that this company underpaid its taxes or overpaid its taxes, then that underpayment or overpayment arises as of the due date for the taxes. So it really is a payment that was owed as of the date the taxes were due, or an overpayment that was owed back to the taxpayer. The tax goes back to when the return was filed, but the interest only accrues later. Well, no, the interest would accrue from—basically, you retroactively are going back and saying interest accrued from the time it should have been paid, either to the government or the taxpayer, when the return was filed. It's just that the determinations might happen later because there's a dispute about whether the tax was due or not. This isn't a great statute in terms of clarity. It may not be, Your Honor, but I think the government's interpretation that was adopted by the Court of Federal Claims offers a great deal more clarity. And I think I would just emphasize here that this is a situation where the taxpayer is trying to go back and say, because of changes that happen within their corporate organization, now they can go back and claim this additional interest. And I think in that context, this is very much like the Fannie Mae case, which is cited in the briefs, in which case this court looked at the special rule for retroactive application of Section 6621D, and this court held that it was a waiver of sovereign immunity that had to be strictly construed in the government's favor. Isn't that a very different context, though, really? That was with respect to this one special rule that allowed an additional right to prior recovery. That's very different than saying the statute itself is a waiver of sovereign immunity, isn't it? Well, I think there are other provisions of the code, other parts of 6621 itself, that provide for interest against the government, and that is the general waiver of sovereign immunity. But terms like this that say when there can be an additional recovery define the terms of the waiver. And the Supreme Court has repeatedly said, and this court said in Fannie Mae, that when something defines the terms of the waiver, I think that is part of the language governing a waiver of sovereign immunity, and it has to be strictly construed. And particularly in the interest context, the Supreme Court has said in cases like the Library of Congress v. Shaw in New York Rand, which are cited in our briefs, that there was traditionally no interest rule. So when Congress has waived immunity to provide interest, the terms of that waiver have to be really strictly construed, and the court should take particular care not to go beyond the terms of what the statute's allowed. But if you look at the legislative history of this statute, this really was intended to be remedial, to strike a balance of fairness that Congress perceived didn't exist under the current code. Well, I think Congress, over a period of years, had asked the IRS to try to do netting in the most comprehensive means that was possible under existing statutes, and having determined that the IRS wasn't capable under existing statutes of doing enough, it enacted this statute that was intended to directly address the question. And I think interpreting it more broadly than what Congress allowed for gets into stepping on Congress's toes with regard to the scope of the waiver. And I think, as the Childress case that's discussed in our brief explains, the Supreme Court, in looking at remedial statutes versus the rule about strictly construing waivers of sovereign immunity, has put the emphasis on construing the waiver strictly. And the Lane v. Pina case is a good example of that, because that dealt with a rehabilitation provision for handicap, which was definitely remedial in nature, but the court focused instead on the waiver of immunity in that case. Would it make any difference if the underpayments made by the parent company occurred at the same time that the overpayments were made by the subsidiaries before consolidation? I don't think so for our purpose. You mean whether the tax years were the same? Is that your question? Here, the underpayments were made after consolidation. I don't think that's correct. Well, I mean, the actual payment was paid over to the IRS after the consolidation. But the issue here, I think, is when the underpayment arose, and that was before consolidation. And that arose before consolidation. That's correct, Your Honor. Would it make any difference if it arose after consolidation for the parent? Obviously, because of consolidation, they'd get the zero in that effect. Is that correct? Well, the underpayment would be the parent's underpayment after consolidation. And I think your question then would be no question that the effect of that particular transaction would be zeroed out. I think there is a question regarding that, Your Honor. I think the issue is whether the same taxpayer has the overpayments and the underpayments. And I think that really creates a big question when you have these issues of, well, when you have an underpayment that belongs to a consolidated group, who does it belong to? And I think in looking at this, I'm aware that some of the Chief Counsel advisories suggest that in that situation, that might be a situation where netting might possibly be allowed. But those aren't precedential authorities. Those are just advice by one attorney at the National Office of the IRS Chief Counsel to attorneys out in the field. And they don't get reviewed at the highest levels like revenue rulings and revenue procedures do, or certainly not to the extent the Treasury regulations do. So you take the position that consolidated parties can never be the same taxpayer under this position? I think that it's not clear that they could. I mean, I think the same taxpayer language really suggests that they wouldn't unless the exact same consolidated group had the overpayment and the same group without changes, or at least without any essential changes, has the underpayment. Because I think when you start looking at it, the theory that comes across in these Chief Counsel advisories is, well, there's a Treasury regulation that says that the underpayment would belong to the group because everyone's liable for it in the group. But then the overpayment, on the other hand, the regulations say is only payable to the parent as the agent for the group. So it's not clear from the regulations who the overpayment would belong to. But you do have some counsel's letters that indicate otherwise. There are. But I think if you think about examples, it just demonstrates that it would be really confusing. I mean, if you say the underpayment belongs to everybody in the consolidated group, for example, and you have, for example, a situation where the consolidated group is 100 corporations and they have an underpayment, if that belongs to everybody, then in year two, if you had one little corporation that's like a teeny, tiny percentage spin off and be a separate entity and it has an overpayment, then it could claim the netting. And then in year three, the big group has an overpayment and says, well, we want netting for that underpayment, and we're the ones that generated it. Why shouldn't we get it? I mean, it just seems like it creates all sorts of problems. And what the legislative history says is that the Treasury should implement netting to the extent it's consistent with sound administrative practice. And I think the sort of confusion and the infighting between the subsidiaries that could come about as corporations reorganize and spin off really dictate that this is not something that is within sound administrative practice. And, in fact, with overpayments, the IRS just pays the overpayment to the parent. There's no way of even allocating on the IRS's part who gets what share. And often that might depend on state law issues, such as the state income tax and what caused an underpayment or overpayment to be generated. Well, the IRS never gets involved in those fights because those are fights that are rather family fights. Right. Those are family fights, and it's given over to the parent to make those calls. Well, joint and several liability makes it otherwise. Well. Because if there's a tax due, it's jointly and severally liable among all the members of the consolidated group. Well, that may be with respect to the underpayment. The same doesn't follow with respect to overpayments. And I think the confusion associated with it not necessarily working both ways just raises the question. I mean, that's not this case. This court doesn't have to decide it here because, in this case, the corporations were entirely separate when the overpayments arose and when the underpayments arose, and there was never any sort of merger here. The corporations remained separate entities with separate taxpayer identification numbers. And, in fact, I think it's important to point out, too, that the netting statute applies to all taxes, whereas filing consolidated returns applies only to income taxes. So it creates another avenue of confusion to get into netting. So our position would be there's a real question whether consolidation can allow netting. But in this case, I think the proper reading of the statute is to look at when the time of the underpayments and overpayments arose. And here, it was all before consolidation. But you're asking us not to decide the broader question. I don't think it's necessary in this case, Your Honor. But you're saying also that Title 26 is a mess. Well, I certainly wouldn't be the first one to say that. But are there any other questions regarding this case? Apparently not. Thank you very much. I think we're just over. Mr. Katz? Your Honor. You have two minutes for rebuttal. Thank you. First, with respect to your question, Judge Gallarza, when I was giving you my answer about the merger scenario, I was thinking, for example, in terms of page 49 and 50 of the government's brief, referring to the merger scenario and also referring to the subsequent scenario you mentioned with the overpayment of the parent coming after post-consolidation. But as the dialogue went further to talk about, that's the Treasury's position in the CCAs, and apparently they're taking a different position here. The thing is, Your Honors, is that this is against the backdrop of 25 years of Congress imploring the Treasury to issue regulations here. And then after a decade of them not issuing regulations to implement comprehensive netting, they finally had to implement 6621D. Another decade later, we're here, still here, still no regulations. There's an inconsistent patchwork that we've talked about here of CCAs. They're suggesting that maybe never can a consolidated group do netting. That's certainly clearly against InterMet and United Dominion, the Supreme Court case that we cited in our reply brief. And against the default rule. Have they ever attempted to issue regulations in this area? Excuse me, sir? Have they ever attempted to issue regulations? Have never. Not under 6621D and not under the consolidated rules. And there's a default rule that the consolidated treatment applies if you don't have a regulation. And you have the United Dominion saying the failure to include in the consolidated regs is better viewed as an inattention. And in fact, that's very consistent with what the legislative history showed. It's inattention and passive aggressiveness in terms of not implementing what the Congress has repeatedly asked the IRS to implement. The consolidated regulations are uniquely sparse. There's like five or six provisions. It leaves all of the legislative authority to implementing consolidated regulations to the IRS. And that's what they've been asking the IRS to do for years and years. And then. Mr. Cass. Yes, sir. As you can see, your time has expired. So we will take the case under advisement and thank you for your arguments. Thank you, your honors.